IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,                    **TRANSCRIPT EXCERPT**

     vs.                                              DOCKET NO.
                                                     1:11-cr-00557-AT-AJB
ALEKSANDR ANDREEVICH PANIN,
and HAMZA BENDELLADJ,

             DEFENDANTS.


**TRANSCRIPT EXCERPT OF SENTENCING HEARING**
BEFORE THE HONORABLE AMY TOTENBERG
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, APRIL 20, 2016



APPEARANCES:

For the Plaintiff:          Kamal Ghali, Esq.
                            Steven D. Grimberg, Esq.
                            Assistant United States Attorneys

For Defendant Panin:        Arkady Bukh, Esq.

For Defendant Bendelladj:   Jay Lester Strongwater, Esq.
                            Emily Strongwater, Esq.


                            JUDITH M. WOLFF, CRR
                            OFFICIAL COURT REPORTER
                            1914 UNITED STATES COURTHOUSE
                            75 TED TURNER DRIVE, S.W.
                            ATLANTA, GEORGIA  30303
                            judith_wolff@gand.uscourts.gov

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1       (Court was called to order at 10:54 a.m.)

2              THE COURT:  Good morning.  Have a seat.

3              Mr. Grimberg, you focused, in your analysis on

4       yesterday, on, obviously, on Mr. Bendelladj.  Tell me what

5       your plans were as to discussing the losses or the -- any

6       issues on the PSR for Mr. Panin.

7              MR. GRIMBERG:  Well, there's no objection as to the

8       losses as to Mr. Panin.  We've agreed that the loss is -- that

9       the loss is no more than $50 million, per the terms of the

10      plea agreement.

11             THE COURT:  Well, I know that was your plea

12      agreement.  Of course, I'm not bound by that.

13             MR. GRIMBERG:  Of course.  But we have, I believe,

14      established through the testimony that we have put on that the

15      loss associated with SpyEye hovers close to a billion dollars.

16             And, so, if his sentencing had been done in silo,

17      without defendant Bendelladj, we would have had an agreed loss

18      number with no objections.  And usually the Court doesn't

19      require evidence taking when there is no objection and there

20      is an agreement.  So that's how we have viewed that.

21             Now, having said that, we still did put on the record

22      evidence about the extent of the harm, and we thought it was

23      helpful to have defendant Panin here for a number of reasons,

24      including the fact that the gravity of the harm affects and

25      impacts the 3553(a) analysis.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1          But as to coming up with the right method, with the

2     right loss number, we have a number that the parties have

3     agreed to with no objections.  So the normal course is for the

4     Court to adopt that if the parties have an agreement.

5          THE COURT:  All right.  Well, I'm not saying I won't

6     adopt it.  I'm just trying to particularly understand the

7     agreement.  And you can stipulate, of course, to anything you

8     like and, you're right, that you've gone in silo, but here I

9     am hearing evidence as to both.  And the PSR went off on a

10    completely different tangent, frankly, in evaluating the loss

11    that you, then, modified.

12         So --

13         MR. GRIMBERG:  Right.

14         THE COURT:  So it's not what's in the PSR, quite, as

15    the basis.  Maybe that's a partial basis, but that's --

16         MR. GRIMBERG:  Well, through the hearing we have put

17    forth evidence that the infections of the computer caused harm

18    and loss.  Again, by the estimate of just Microsoft alone, the

19    loss was around $750 million.  The harm of identity theft, of

20    the stealing of the financial and personal information,

21    impossible to quantify when you talk about all of the

22    customers who SpyEye and the hundreds of millions of people

23    that were being impacted by the use of SpyEye.

24         But here we have one user, Bendelladj, and his

25    electronics.  And just with that one user we have a loss of

1    $265 million.  So, I think that should give comfort to the

2    Court that the foreseeable loss that we have agreed, to with

3    Mr. Panin of $50 million, is incredibly reasonable.

4              THE COURT:  I have complete -- I completely

5    understand your point.  I'm just trying to understand it as a

6    matter of kind of what, objectively, may be true even though

7    you may have agreed to this.  And it's not that I'm unwilling

8    to accept that.

9              MR. GRIMBERG:  Yes.

10             THE COURT:  Because that's part of your plea

11   agreement, and I understand your rendition of this and -- but

12   it may be -- it's such a -- I still have to understand it

13   relative to how it impacts the entire picture of the

14   sentencing of his codefendant.

15             MR. GRIMBERG:  Right.

16             THE COURT:  And as I understood it that Mr. Panin

17   had, you thought, at least a hundred -- a list with 150

18   clients which Mr. Bendelladj wasn't even on that list.

19             MR. GRIMBERG:  He was one of them.

20             THE COURT:  He was not on the list.

21             MR. GRIMBERG:  I'm sorry.  Mr. Ghali has corrected

22   me.  He was one customer.

23             THE COURT:  He was one customer and there were 150

24   other customers that we already know of on the list.  And you

25   probably know of others that we just haven't discussed here.

1          MR. GRIMBERG:  Right.  Right.  But to you question --

2    and your original question was in terms of my presentation

3    yesterday, how that relates to Mr. Panin, obviously, the

4    impact of SpyEye, all of that relates to the author of SpyEye.

5          And our position is that by virtue of the fact that

6    he was the author of SpyEye, the harm that was foreseeable to

7    him included not only the infections upon the computers and

8    the impact that that had, but also by virtue of the fact that

9    this malware was designed to steal personal financial

10   information, that that harm is also foreseeable to him.

11         So to the extent -- I may have not said this

12   explicitly in my presentation yesterday, but all of that harm

13   is also attributable to defendant Panin.

14         THE COURT:  All right.  Thank you.

15         MR. GRIMBERG:  One housekeeping measure, your Honor.

16   We discussed yesterday, through the witness, through, I

17   believe, the defense expert, Government's Exhibit 24.  I don't

18   believe --

19         THE COURT:  What was it?

20         MR. GRIMBERG:  It was admitted.  It was the directory

21   of the Grabber file.  We just want to tender that as an

22   exhibit.

23         THE COURT:  Are there any objections?

24         MR. STRONGWATER:  I don't think we have an objection

25   to it.

1        THE COURT:  Then it's admitted.

2     (Government's Exhibit 24 admitted into evidence.)

3        MR. GRIMBERG:  (Handing.)

4        THE COURT:  All right.  And there was an outstanding

5  issue as to Mr. Bendelladj's offer of Exhibit 10, a January

6  10, 2014, letter signed by Mr. Ryan Scott Ferber, which

7  starts, Dear Counsel, In response to your email about the

8  charge of conspiracy and attributable loss, we have the

9  following information:

10       And there are no restrictions on this letter as to

11  use.

12       This is my view.  It is admissible.  It's not --

13  doesn't have a restriction on its use.  But it is written

14  January 10, 2014, and things changed in terms of the analysis.

15       And while things can constantly evolve and,

16  obviously, I think there has to be a reasonable point and I've

17  already indicated where we are going to stop having all the

18  analysis constantly change and evolve; i.e., post -- at the

19  beginning of sentencing, I think January, 2014, is an early

20  point.

21       So, I don't think it really has much probative

22  weight.  So I'm going to admit it but I just will say that

23  it's clear that the government did a lot of analysis after

24  this and I don't think it has much weight.

25       MR. GRIMBERG:  Your Honor, that's fine.  As to the

probative or lack of probative value that it has, let me just point out that you're right, it was January, 2014, Mr. Ferber placed Mr. Strongwater on notice that Bendelladj's electronics contained over 80,000 fraudulently obtained credit card pulls. And, obviously, that was what the investigation had discovered to that point.

And two years later we have done more analysis, as the Court has pointed out. It was not at all intended to be limiting in nature.

In fact, during the plea colloquy for Mr. Bendelladj, I cited that his electronics contained over 200,000 accounts. So I'm not sure what probative nature this has because, obviously, the investigation is always continuing. And before he -- before the Court accepted his plea of guilty, we placed him on notice that we had found over 200,000.

And, so, I think it has very little probative value, but the Court's ruling is what it is.

THE COURT: All right. Are there any other housecleaning matters as exhibits?

MR. STRONGWATER: I think we -- no, your Honor.

THE COURT: All right. Did you have anything more you want to say on the 3553 factors, Mr. Grimberg?

MR. GRIMBERG: Yes. Are we doing that in conjunction with the loss?

THE COURT: I am. I am going to do it all together.

1   I would just like to hear everything, be able to stop, go back

2   and look at anything raised by the -- by you all, and then

3   make a decision.

4         MR. GRIMBERG:  All right.  What I would like to start

5   out with, your Honor, is one fact that I think we've lost

6   sight of during this sentencing hearing and it was,

7   thankfully, pointed out to me by one of my team members last

8   night.

9         We've been talking last month and this month about

10  access devices, and account numbers, and stolen bank

11  credentials and stolen credit card credentials.  We wouldn't

12  be here if we were just talking about numbers.  But we're

13  talking about people, real people.  These are real victims.

14        Each of those account numbers represents a person.  A

15  person with a family.  A person with jobs who put their

16  hard-earned money into their bank accounts, who use that

17  hard-earned money to pay their credit cards.  And, this

18  impacted real people with real lives.

19        And it may be that their bank or their credit card is

20  able to ultimately reimburse them for fraudulent activity, but

21  that shouldn't take away from the fact that this person was

22  impacted.  This person's identity was stolen.  This person had

23  to go through the trouble of trying to get their money back

24  through their bank or their credit card company.

25        Anyone who has been the victim of identity theft --

1 and I don't know if your Honor has but most, when we do jury

2 selection in identity theft cases, it's almost a ridiculous

3 question to ask who has been the victim of identity theft

4 because virtually every hand is raised.

5      And anyone who has, they are rightfully offended when

6 we say, well, you didn't suffer any harm.

7      THE COURT: And I want to say I haven't lost sight of

8 that. I haven't lost sight of that, because we deal with

9 identity theft cases.

10      MR. GRIMBERG: Right. And to that point, your Honor,

11 I would like to tender Government's Exhibit 54 which shows the

12 gravity of the harm that was caused, particularly by

13 defendants Panin and Bendelladj.

14      This crime that was conducted by them made the cover

15 of *NewsWeek* magazine in 2014. It is an article entitled, *The*

16 *$500 Million Cyber Heist*. His software, talking about

17 defendant Panin, made it possible for anyone with a

18 larcenynist's heart to empty out your bank account.

19      And it goes on to discuss the ways in which defendant

20 Panin and defendant Bendelladj and others engaged in this

21 crime, and how nefarious it was in that it not only emptied

22 out bank accounts and credit cards, but did so in a way that

23 masked the theft so that when someone looked to their bank

24 account and looked to see the balance, it didn't actually show

25 that money had been taken. And it was the true nefarious

1  nature of this software.

2         It says it was one of the biggest heists in history,

3  fleecing half a billion dollars from people around the globe

4  and almost no one, except a small group of feeds, the

5  confederates and the white hack computer sleuths chasing them

6  through cyberspace, knew it was taking place.

7         And it goes on to cite defendant Panin and,

8  specifically, Bx1, defendant Bendelladj, as someone who helped

9  him promote and distribute this nefarious software.

10        So, with that your Honor, I would tender Exhibit 54.

11        THE COURT:  Any objection?

12        MR. STRONGWATER:  Objection to relevance.  It's a

13  generic statement regarding cyber crime.  The government has

14  fussed about us not identifying authors or having that offered

15  in but, at the sentencing hearing I understand proffers are

16  permissible, and when it's our turn for Mr. Bendelladj to

17  speak, we may have proffers as well.

18        So under the goose and gander rule, we have no

19  objection.

20        THE COURT:  All right.  Under the goose and gander

21  rule, I'll let it in for whatever value it has.  It is a news

22  article, so it is -- it's not direct evidence.

23        MR. GRIMBERG:  And it's not meant to be.

24        THE COURT:  It's just a perspective.

25        MR. GRIMBERG:  It's a perspective.  We objected to

the admission of anonymous articles as record evidence in the case. This is now the 3553 aspect. And it gives a perspective on the gravity of the harm, particularly to the point I was making, your Honor, about the impact it has on lives.

THE COURT: All right. I'm going to have to remember the goose and gander rule. Not because we don't talk about it in many different trials, we just haven't elevated it to a formal rule when it goes into the rule books.

All right, go ahead.

MR. GRIMBERG: Your Honor, we spent a lot of time during this hearing analyzing these 13 files that were found on Bendelladj's electronics. And I'm afraid, also, that we've lost sight of the fact that this really was just the tip of the iceberg. It was meant as a representative sample, if anything, to extrapolate from. It was not intended to be the total universe of data.

In fact, we heard from Agent Ray that, in his analysis of the electronics, there were 3,000 files -- not 13, but 3,000 files -- on defendant Bendelladj's computers that contained access devices. Four terabytes of data.

In fact, when I was asking questions of the defense expert and the limited scope of his analysis in that he only looked at four of the files, he scoffed at the idea that he could have reviewed four terabytes of data. It shows the

extent to which this one defendant, this one user of SpyEye

had and the impact it had and the scope of the access devices

he had access to.

Agent Ray, who I think no one would dispute has

incredible amounts of experience in the cyber arena and cyber

forensics, in cyber crime, said in all of his years of

experience, in all of the subjects that he has looked at with

cyber crime and stealing of personal financial data, he was

astounded.  He had never seen a subject with this much

personal information on his electronics.  Never.  This was an

unprecedented amount of information.

And, so, we can try to parse the numbers and try to

dispute the exact number of access devices off of these 13

files but, again, this was just a sample.  It was meant as an

extrapolation.  It was meant to show why our request of a $100

million loss is eminently reasonable.

We've established, your Honor, I think without a

doubt, that the harm and the loss in this case is truly

astounding.  And we're asking -- again, the loss was -- you

may disagree but we believe that loss, when you factor in the

infections of the computer, the loss of the credit card data,

hovers around $100 billion.  And we're asking for the Court to

make a finding of 10 percent of that, 100 million.

How did the defendants compare?  Your Honor asked

that question several times and rightly so because that is

part of your analysis.  I think the indictment in some ways

does not do it justice because it was centered around SpyEye

and defendant Panin.  And, certainly, he is culpable and

responsible for all of the harm that flows from the

development, promotion and distribution of SpyEye.  He was the

author of it.

He knew full well the harm that it could cause and

was aware that this was being used for the purpose of stealing

personal and financial information.  But that's where his

criminal activity really started and ended.  He wrote the

software.  He sold it and distributed it and made money off

the sale of the software.

THE COURT:  And updated it continually.

MR. GRIMBERG:  Updated it, yes, through the number of

years.  For sure.  And he is responsible for that.  We believe

the plea agreement rightly accounts for the scope of his

criminal activity.

But when you look at defendant Bendelladj, in many

ways he was worse because -- and it evolved -- his criminal

activity evolved over time.

First, he helped defendant Panin promote SpyEye.  As

we saw, he vouched for him and his reputation on the Dark code

web forum which, as Agent Ray testified, was a very

significant assistance to defendant Panin in helping to

distribute and sell this software.

1    That evolved into him helping make SpyEye better, to

2 improve it.  He developed and sold, on his own, accessories to

3 SpyEye.  What are called plug-ins or add-ons such as Spreader;

4 the Automated Transfer System, ATS; and Web Injects.

5    All of these accessories that defendant Bendelladj

6 himself wrote, promoted and sold were helping to spread the

7 distribution and sale of SpyEye and make it even more

8 nefarious, even more attractive to the cyber criminal

9 community.

10    From there his activity evolved to the point where he

11 cracked the source code for SpyEye.  Not because he wanted to

12 take it down, not because he wanted to stop its use in

13 criminal forums; but because he wanted to sell it himself.  He

14 wanted to -- it was the equivalent of selling the knock-off of

15 a Guicci bag.  He was selling it himself, distributing it

16 himself so that its distribution could be even more widely

17 spread.

18    From there, your Honor, his activity evolved even

19 more.  Not only using SpyEye, along with other botnets to

20 infect computers and steal personal and financial information

21 from all over the world for himself, but also doubling down on

22 those infections by selling those credit card and access

23 devices on his own virtual credit card website.

24    And so when we look at the spectrum of his activity,

25 he not only helped defendant Panin promote, distribute and

1  sell SpyEye, but he took it to another level by making it

2  better.  By increasing its distribution around the world, by

3  using it himself to infect computers and steel information,

4  and then selling that information in bulk to other cyber

5  criminals.

6         Think about it, your Honor.  When you steal someone's

7  personal financial information and then sell it by the

8  hundreds, by the thousands, what do you think the customer of

9  that is going to do?  They are going to use those credit cards

10  over and over and over again.

11         And, you know, in looking at those files, those 13

12  files, we did the defendant a favor by deduping the account

13  numbers to try to find just unique access devices.  But that's

14  not consistent with the nature of his criminal activity.  He

15  wasn't only selling unique access devices.  He was selling the

16  same access devices over and over and over again.

17         And, so, just because an access device appeared on

18  two different data sets doesn't mean it wasn't used twice or

19  more.  He was selling these in bulk and selling the same

20  account numbers over and over again.

21         Your Honor, I would like to address deterrence --

22         THE COURT:  The what?  Deterrence, okay.

23         MR. GRIMBERG:  As 3553(a) factors, both specific as

24  to these defendants and also general deterrence.  I want to

25  address the defendants' respective ages first because,

obviously, that's sort of the elephant in the room.  I'm sure the Court is quite cognizant of that.

These are young men and they have, hopefully, long lives to lead from here.  But what we want the Court to know and observe is that this is not a surprising phenomena in cyber crime.

The Court at one point expressed surprise that defendant Bendelladj could have been engaged in computer hacking activities back from the age of 15, because I think there was some indication that he had been using the Bx1 moniker all the way back since he was age 15.  That's not surprising to us.

There are scores and scores of investigations that we do in conjunction with our law enforcement partners all over the world.  We have unbelievable cyber activity, cyber crime activity that has occurred and we spend countless, countless hours of investigative resources to try to track down who is responsible for this nefarious criminal activity, only to find out, ultimately, at the end of many, many months, many, many years, scores and scores of legal processes, that it turns out that the individual behind it is a minor.  A 16-year-old living in Germany, living in his parents' home, living in a basement of a family member.

And usually the investigations end there.  Obviously, you know, in the federal system here it's very difficult to

1  prosecute minors.

2         But this cyber crime activity starts at a very young

3  age.  It is the nature of the crime.  And what we do in those

4  situations when we spend all those hours and all those

5  investigative resources and find out that the subject is a

6  minor, what we do is we try to disrupt.  Disrupt the criminal

7  activity by essentially trying to scare them straight.

8         We talk to them.  We show them the evidence that

9  we've uncovered and we try to place them on the right path.

10  And the right path, in a way, is by pointing out to them the

11  consequences of what will happen if they continue with this

12  activity when they reach majority age.  And we try to cite to

13  them through examples of individuals who have been prosecuted

14  and convicted for this type of cyber activity.

15         Gribodemon and Bx1 are legends in these communities

16  around the world, your Honor.  When they were arrested, the

17  cyber underworld was aflutter about what would happen.  And

18  that cyber underworld is watching very closely to see what

19  will be the consequence for their criminal activity.

20         Many of these individuals are minors, and they are

21  watching this activity to see what is going to happen.  What's

22  the worst that's going to happen if I continue in this

23  activity?  There is a lot of attention being paid all over the

24  world to what the sentences will be for these two individuals

25  who for most of their activity were known only by their

1 monikers, Gribodemon and Bx1.

2      These cases take an immense amount of investigative

3 resources. So many of these cases end up in dead ends because

4 it requires international cooperation. All you need is a

5 computer and an internet connection to engage in criminal

6 activity and that can happen virtually from any corner of the

7 world. And it makes these cases extremely difficult to

8 investigate, extremely resource-intensive and, oftentimes, we

9 end up with a subject who is either a minor or in a country

10 that is not going to cooperate or a country that is unwilling

11 to extradite for cyber crime activity.

12      THE COURT: Where was Mr. Panin extradited from?

13      MR. GRIMBERG: Panin was actually flying -- he was

14 traveling, actually flew through Atlanta, and he was arrested

15 at his stopover in Atlanta.

16      THE COURT: That's what I said, because you said give

17 him credit for how long it took to get him extradited.

18      MR. GRIMBERG: Your Honor, no. I was talking about

19 defendant Belorrosov.

20      THE COURT: Belorrosov, I'm sorry.

21      MR. GRIMBERG: So that was to my point, your Honor.

22 This case is a quote, unquote, "success story," from a law

23 enforcement standpoint not only because of the incredible work

24 of Agent Ray and his colleagues, but because of some lucky

25 breaks.

1    The fact that defendant Panin traveled through

2 Atlanta and we were able to arrest him here; the fact that

3 defendant Bendelladj traveled to Thailand for vacation and the

4 Thai authorities cooperated and allowed us to arrest him

5 there.  No doubt traveling on their ill-gotten gains.

6    You wouldn't think that individuals of this age would

7 be world travelers, so how do you think they are funding that

8 travel?  They were traveling with their ill-gotten gains.  And

9 we had some lucky breaks.

10    But those lucky breaks are few and far between in

11 cyber crime.  Your Honor has been on the bench now for several

12 years and I don't know that you've ever seen a case like this.

13 This is a very significant, very unique success story in the

14 cyber crime world and that makes general deterrence all that

15 more important.

16    Because these are not every-day cases that are

17 prosecuted.  These are cases that really, truly send a message

18 to the cyber criminal underworld around the world.  And we

19 have no doubt that it is being followed.

20    These cases depend a lot, frankly, on cooperation

21 because of these cyber underworld forums that have such

22 exclusive access.  We build these cases in many ways by virtue

23 of the cooperation of defendants.  Defendants who are

24 arrested, who help us gain insight into the cyber criminal

25 forums and are able to help us develop leads for others, for

1   other subjects and for other targets.

2       Defendant Bendelladj had that opportunity from day

3   one.  He had the opportunity to help us.  Certainly he had a

4   treasure trove of information.  Keys to a cyber underworld

5   that law enforcement does not have access to.

6       THE COURT:  Counsel is standing.

7       MR. STRONGWATER:  Your Honor, the government fussed

8   at us trying to say what Mr. Ferber's perspective of the case

9   was.  Mr. Grimberg wants to go into the reasons why a plea

10  offer was extended and rejected.  I think, one, it's

11  irrelevant and, two, if the Court thinks it's relevant, it

12  takes us off on an incredible tangent about what the offer

13  was, what the consideration was, and why it was no.

14      I don't think Mr. Grimberg's pontificating about him,

15  the government, being generous and wanting Mr. Bendelladj's

16  cooperation is relevant at this point because there are too

17  many other factors for the answer being no and why we are

18  here.

19      THE COURT:  Well, I understand there are a lot of

20  factors but I'm going to allow him to address it.  I mean,

21  obviously, I am understanding there are factors in everything,

22  just as with the 2014 letter, but I'm willing to hear.

23      MR. GRIMBERG:  The point, your Honor, is that he had

24  the opportunity, just as all cyber criminals have the

25  opportunity, to help us build these cases that are very

1 challenging and very investigative intensive, and he did not

2 take that opportunity.

3     And I think when you look at the chats, his online

4 chats, many of which were incorporated into our sentencing

5 memorandum, you get a good perspective for what kind of person

6 this is and why he didn't cooperate and why he is here today.

7     Your Honor, he is, if you look at those chats, you

8 have a -- almost a voyeuristic ability to see the true -- his

9 true colors to come out.  He is an incredibly arrogant,

10 narcissistic person.  He is sitting there, your Honor, I

11 guarantee you, back there in this courtroom, looking at us

12 saying I am the smartest person in this room.  I am going to

13 beat this system.

14     He is proud of the fact that he was able to mask

15 probably the majority share of the criminal activity that he

16 has engaged in.  He thinks he can beat us and he has every

17 intention of continuing to do so the day he walks out of that

18 prison.

19     And here's the difference between this type of

20 defendant and the other defendants that you see day in and day

21 out.

22     With other defendants, first-time defenders, young

23 defendants, the Court probably says okay, I'm going to impose

24 a sentence that imposes a just sentence for this crime but, if

25 he comes back next time, he's going to really get the message.

1          Here's the problem, your Honor.  There is not going

2   to be a next time with this defendant.  Not because he's not

3   going to commit the crime, but because we will never have the

4   opportunity to impose punishment on him ever again.

5          The day he walks out of that prison he is going to be

6   removed from the country, probably back to his home country,

7   he's not going to make the same mistake he made that landed

8   him in prison and here today.  He is going to continue his

9   criminal activity but he's going to do it in a way that makes

10  him unreachable to U.S. law enforcement.

11         He hates the United States.  That's clear from his

12  chat messages.  And he is going to inflict pain on the country

13  and the citizens in every way that he can.  And we are not

14  going to be able to reach him ever again.  He has no intention

15  of stopping.

16         I don't know of any other --

17         THE COURT:  He might be oblivious, but I don't get

18  the hatred -- I mean, he might be oblivious of the harm he

19  caused to people and particularly in the United States where

20  the large number of people -- victims -- were, but I don't

21  know why you translate that into sort of the next measure of

22  hate.

23         MR. GRIMBERG:  Okay, well --

24         THE COURT:  I mean, I have certainly read all the

25  things that you attached to your memorandum and the chats, as

well as anything else that was brought out in the evidence.

But -- and I understand the overall point, I want to say.  I

just -- I'm sort of reacting to the hate.

        MR. GRIMBERG:  I understand.  He understands -- and

that is the point, your Honor, that he is -- I have not seen

or observed him being contrite for what he did in any manner.

He is remorseful that he got caught.  But he is anxious to get

back out there and continue his activity, only in a way that

makes him unreachable to law enforcement.

        And, so, your Honor, our -- again, I know we're

addressing all of this at once, so with regard to defendant

Bendelladj, we believe, for all the reasons that we've stated,

that the loss, a loss finding of $100 million is eminently

reasonable given the gravity and scope of the harm that was

caused.

        That places the loss at a level 24, which is a range

of $65 to $150 million.  After three levels of acceptance,

that nets his guideline range to a level 36, at Criminal

History 1, which is 188 to 235 months.  And we ask that

defendant Bendelladj be sentenced to the low end of that

guideline range, 188 months with -- I'll give you a minute, if

you need a minute, your Honor?

        THE COURT:  No.

        MR. GRIMBERG:  With regard to defendant Panin --

        THE COURT:  If you could just hold on a second.

1            MR. GRIMBERG:  Yes.

2            THE COURT:  I want to look at the PSRs again, to make

3     sure I've got it.

4            So, in terms of the PSR, basically because we -- you

5     agreed to a reduction from 2 to 4, it brought it down from

6     what was recommended.

7            MR. GRIMBERG:  Right.  We stipulated to a role of 2.

8            THE COURT: All right.  All right.  I just was trying

9     to make sure I had it right.

10           MR. GRIMBERG:  Yes.  So that would be 36, and we're

11    at the low end of that, 188.

12           THE COURT:  All right.

13           MR. GRIMBERG:  With regard to defendant Panin, after

14    application of the fourth point, he nets out at a level 35.

15           THE COURT:  The fourth point being the variance that

16    you agreed on in the plea agreement?

17           MR. GRIMBERG:  I'm sorry?  The fourth level was

18    agreed on, yes.

19           THE COURT:  All right.

20           MR. GRIMBERG:  So that's a level 35.  Has our under

21    seal motion been read?  I believe it has --

22           THE COURT:  Well, do you want to have a moment

23    without everyone --

24           MR. GRIMBERG:  We stand by our filing, if you've

25    reviewed that.  If you need to hear more, we can.

1          THE COURT:  No, that's all right.  That's all right.

2     That's why I was asking you some questions, larger questions

3     beforehand.

4          MR. GRIMBERG:  Okay.

5          THE COURT:  And if I it do at the end, then we'll

6     just do it at the very end and allow everyone to leave.

7          MR. GRIMBERG:  Okay.

8          In light of that, in that motion we ask that he be

9     sentenced to a term of 120 months.

10          THE COURT:  All right.  Thank you, very much.

11          All right.  You know, I'm going to allow Mr. Panin's

12     counsel, first, to go ahead.  You're longer and I want to be

13     sure, for once, that he gets first play.

14          MR. BUKH:  Your Honor, I would like to inform you

15     that we will be withdrawing all our presentencing objections,

16     so we are in full agreement with the government.

17          Your Honor, my client is a young man.  He is very

18     intelligent, very talented.  While in Russia, he was dreaming

19     of pursuing a career in bioengineering as he became fascinated

20     with anti-aging and important areas of science.  Deeply at

21     heart, he is a scientist.

22          Even in prison he is reading science books in hope

23     that one day he will be a fighting force against mankind which

24     is aging.

25          This is who he is.  A dreamer.  But, on the other

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1  hand, the person who sets himself to reach goals.  It's very

2  unfortunate to see this, it's sad to see this brilliant man in

3  a courtroom charged with very, very serious crime -- for which

4  he takes responsibility fully, the ill-reality that he is

5  charged with a crime, this serious federal offense.

6        It is important to know that he never had problem

7  with law before.  Again, he accepted full responsibility for

8  his crimes.  He deeply regrets what his action, the necessity

9  for the government to investigate and prosecute him.  He

10  accepted it fairly quickly.  He consented to prosecution.  He

11  flew from Dominican Republic.  He basically waived

12  extradition, so he never fought the extradition.

13        He is very -- I mean, he is extremely embarrassed and

14  humiliated by his actions.

15        We absolutely agree with the prosecution that his

16  product, his software, his baby, I would say, is a gun which

17  give opportunity for robbers to rob the banks while modifying

18  the same gun, same software in a way to steal better while

19  knowing what's going on.

20        But from another perspective, your Honor should

21  understand what his financial gains are to this.  It's

22  definitely not a loss.  It's a loss that could have been

23  billions.  I mean, speculatively, we can speculate that some

24  hacker is still using his software and still stealing the

25  money.

But, your Honor, keep in mind, he could not afford a car.  He used his bike.  He couldn't afford to pay his $408-something rent for months.

So that's who he is.  I mean, he's a scientist.  He admits responsibility for what he has done.

He's 27 at this time.  At the time the software was created, he was a minor.

THE COURT:  He was a minor?

MR. BUKH:  It was 17, 18, 19.

THE COURT:  I thought it went on in 2010, and we're at --

MR. BUKH:  Well, 2009, 2010 when he was kind of under investigation.  But the development and involvement -- so, I mean, the prosecutor is absolutely right.  He is from that specific age group.

Mr. Panin has strong family ties.  Mother, friends have all been supporting him.  We have got dozen letters of accommodation.

THE COURT:  And I have reviewed them, thank you.  I know that they were given to me.  I don't know whether you ever supplemented them in the record.  If you want them because you referred to them as attached to your sentencing memo and, then, last March, I asked where are they because they weren't attached.  And now they have come to me, but independently in the file.

1          So, if you want them to be part of the record, you

2     can make them -- offer them, or else file them.

3          MR. BUKH:  We will submit them, your Honor.  But,

4     your Honor, the letters are just to remind you that he is a

5     great guy.  He's a great scientist and he is a great friend

6     and a son.  I will submit them.

7          I respectfully request the Court impose a

8     nonguideline sentence.

9          3553(a) said that sentence should be sufficient but

10    not greater than necessary.  I respectfully suggest to the

11    Court, again, nonguideline sentence to meet the needs of the

12    sentencing statute, which will also permit Mr. Panin to

13    rebuild his life.

14         THE COURT:  All right.  You've indicated constantly

15    you agree with the government so, are you agreeing with the

16    sentence as an appropriate sentence?  Or are you asking for

17    something different?

18         MR. BUKH:  Your Honor, that is the government's

19    recommendation.  We are asking for your decision to --

20    whatever you feel is proper at this time.

21         We cannot -- I mean, we have a recommendation, we

22    have the plea agreement.  I mean, if you decide to deviate

23    from the guideline, we will be happy.

24         THE COURT:  All right.  Would Mr. Panin like to

25    address the Court?

```
 1              MR. BUKH:  Yes, your Honor.

 2              THE COURT:  Do you want to come and stand here?

 3              DEFENDANT PANIN:  Your Honor, if someone told me a

 4    few years ago that I would be standing here in federal

 5    courthouse as a defendant, involved in serious criminal case,

 6    I would never believe it.

 7              However, I am here.  My whole life, I never compel to

 8    hurt anyone but, unfortunately, my actions caused a lot of

 9    financial damage.  I can only attribute those results to my

10    own stupidity and judgment and wrong decisions.

11              I want everyone in this courtroom to understand that

12    my actions are inexcusable and inexplicable.  I deeply regret

13    what I have done.  And for all of this I want to apologize to

14    you, to the government, the people of the United States.

15              I know, your Honor, you will do what you believe is

16    right, and I am fully prepared to accept whatever decisions

17    you make.  I have gotten myself into this predicament and I

18    will accept responsibility for my actions.

19              However, I do want to let you know that I will never

20    repeat those mistakes again.  I will not break the law.  And

21    all I want is another chance to start my life over and move

22    forward, towards my life goals and future achievements.

23              Thank you, very much.

24              THE COURT:  Thank you, very much.

25              All right.  Mr. Strongwater?
```

1    MR. STRONGWATER:  Your Honor, I think there are three

2 categories or three topics to address with increasing

3 difficulty for complexity.

4    The three topics as I have them broken down

5 sentencing issues would be an analysis of SpyEye; moving from

6 that, a discussion of the credit cards with subparts; and the

7 third is discussing 3553 factors of what would be reasonable

8 in light of the evidence -- rather than speculation that's

9 been presented to the Court -- as well as comparing

10 Mr. Bendelladj to others.

11    Starting with a cap of 188 months, we obviously are

12 asking the Court for something substantially less.  But let me

13 start at the beginning.

14    When we talk about SpyEye, it's undisputed that

15 Mr. Panin is the author of SpyEye.  We have testimony from

16 Agent Ray that he is aware of at least 80 versions of SpyEye.

17    We asked Mr. Rey if he was familiar with the coding

18 of SpyEye?  We published a statement from Security Research

19 that said that SpyEye versions numbers collected in the range

20 from 10060, which is memorialized as 1.0.60, to 10299, which

21 is shown on versions as 1.2.99.

22    THE COURT:  1.209?

23    MR. STRONGWATER:  I'm sorry.  1.2.99.

24    THE COURT:  Okay.

25    MR. STRONGWATER:  And Mr. Ray agreed with the

1    statement in the range of 43 versions, all in less than one

2    year.  The most commonly seen version, probably the most

3    popular bills are 10070, 10280 and 10299.

4         So we have 80 versions of SpyEye.  We have testimony

5    and admission by Mr. Panin that he is the author of the 80

6    versions of SpyEye.  We don't know --

7         THE COURT:  Is it 302?

8         MR. STRONGWATER:  Just his admission.

9         THE COURT:  You mean now?

10        MR. STRONGWATER:  Yes.  So we know that he's the

11   author.  We know that there were multiple versions.  What we

12   still don't know is how versions were modified from one, the

13   earlier, to the next to the next, whether -- we don't know the

14   level of sophistication.  We don't know what was added, we

15   don't know when it was added and the like.

16        We also have testimony that Mr. Panin acknowledged

17   that he had 154 customers.  The government introduced

18   testimony or an exhibit that listed all of Mr. Panin's

19   customers, and then added that Mr. Bendelladj was not on the

20   list but, nevertheless, he should be a customer.  So that

21   comes to 155 customers.

22        So, when the Court considers what's relevant conduct

23   or what is attributable to Mr. Bendelladj, the Court needs to

24   look at the *Hunter* case and 1B1.3 of the guidelines, talking

25   about what is foreseeable.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1     And what's foreseeable or what's relevant conduct for

2  the use of SpyEye has three elements:  Was the activity within

3  the scope of the jointly undertaken criminal activity?  Was it

4  in furtherance of that activity?  And was it reasonably

5  foreseeable in connection with that criminal conduct?

6     We are talking high technical and I thought I might

7  go low technical, relying on the Bendelladj diagram to show we

8  have been talking generically about SpyEye.  We've talked

9  generically about Mr. Panin's activities; and we've been

10  talking about the versions; we've been talking about the

11  number of customers.

12     But we haven't been able to identify the versions

13  that are attributable to Mr. Bendelladj.  The only thing we

14  have that's hard evidence is Mr. -- Agent Ray's affidavit

15  where he says he sees the computer located in Atlanta, which

16  gives the Court jurisdiction and venue over Mr. Bendelladj.

17     A review of that computer shows that there is -- let

18  me check, 217 infected IP addresses.  Period.  Agent Ray has

19  not been able to identify any other IP addresses that were

20  infected, generically.  Agent Ray has not been able to specify

21  or identify additional IP addresses infected by SpyEye

22  software that's attributable to Mr. Bendelladj.

23     THE COURT:  You mean as to that server?

24     MR. STRONGWATER:  Worldwide.  Three and a half years'

25  investigation from the time of Mr. Bendelladj's arrest, in

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1 | January of 2013, as we sit here today the government has

2 | identified 75 IP addresses infected by Mr. Bendelladj.

3 |        The balance of --

4 |        THE COURT:  75 -- you just told me about 217

5 | infected.

6 |        MR. STRONGWATER:  I'm sorry.  The computer we're

7 | talking about is 75 dot, and there is a string.  So we refer

8 | to it as the 75 server.  I'm sorry --

9 |        THE COURT:  So, but, you're saying --

10 |        MR. STRONGWATER:  The 75 sever, the government found

11 | 217 infected IP addresses.

12 |        MR. GRIMBERG:  Your Honor, I'm going to interrupt.

13 | To the extent you're taking down -- none of this was actually

14 | in the record.  He's stating facts that were not in the record

15 | that --

16 |        THE COURT:  I think the 217 and the 75 IP, we had

17 | testimony about that.

18 |        MR. GRIMBERG:  Well --

19 |        MR. STRONGWATER:  We also introduced Agent Ray's

20 | affidavit that specifies those numbers.

21 |        MR. GRIMBERG:  Well ...

22 |        THE COURT:  I mean, do you disagree as to that?  I

23 | distinctly recall Agent Ray being asked questions about this,

24 | and the server.  So, I'm not -- I'm just not tracking what --

25 | there not being evidence.  Of course, you know, I could have

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1  been confused.

2          MR. STRONGWATER:  Your Honor, Exhibit B, after all

3  these different relabeling of it, B2, page 11, is an affidavit

4  -- it says, at paragraph 15, 217 unique victim computer bots

5  located in approximately 1900s.  Approximately 47 of the IP

6  addresses were assigned to victim computers located --

7          THE COURT:  Don't go so fast.

8          MR. STRONGWATER:  I'm sorry.

9          THE COURT:  Don't go so fast.

10         MR. STRONGWATER:  I'm sorry.  Paragraph 15 talks

11  about the Bx1 server.  It says:  "In this file I observed

12  certain get requests.  Approximately..." -- the get request

13  contained approximately 217 unique IP addresses which

14  represents communications to at least 217 unique victim

15  computers (bots) located in approximately 19 different

16  countries.

17         This is a forensic review of Mr. Bendelladj's server

18  known as 75 server that was located in Atlanta and searched by

19  Agent Ray.

20         THE COURT:  Okay.  Well, I think that is evidence.

21  The only thing is we also had evidence that the Norwegian

22  company had identified, I think, 59.

23         MR. STRONGWATER:  They identified -- I'm sorry to

24  interrupt.

25         THE COURT:  That's all right.

          MR. STRONGWATER:  They identified a certain number of

strands in what Agent Ray described as a honey bot and, if the

Court is accepting that as infected IP addresses, we would be

glad to throw in that number as well, on top of the 217.

          The key point being that the government has talked

about SpyEye without any particularity and applicability to

Mr. Bendelladj, and that substantially undercuts their

argument regarding SpyEye.

          It's manifested in the loss declarations of

Mr. Patel.  There are two loss declarations submitted to the

Court for consideration of loss.  One was the declaration by

Vishant Patel, which is Government's Exhibit 25 and, I'm

sorry, I apologize to the Court, I don't have the exhibit

number, but there was the report from financial services,

ISAC.

          In both instances -- well, let me deal with them --

do you have that exhibit?

          THE COURT:  Do you know what the exhibit number was?

I can go back again.

          COURTROOM DEPUTY:  25, your Honor.

          MR. STRONGWATER:  25.

          THE COURT:  Patel.  What about the other one?

          MR. GHALI:  I believe it was 19, but we can check.

          MR. STRONGWATER:  19.

          COURTROOM DEPUTY:  19 is the other from financial

1   services.

2           THE COURT:  Number 19?

3           COURTROOM DEPUTY:  Yes.

4           MR. STRONGWATER:  When we look at Government's

5   Exhibit 19, the accounting of number of computers or cyber

6   intrusions includes SpyEye and Zeus.  It does not -- is not

7   limited just to the SpyEye.  It's broader than what

8   Mr. Bendelladj --

9           THE COURT:  So we're talking about 19 now, and not

10  25?

11          MR. STRONGWATER:  I -- yes.

12          THE COURT:  Which one are you talking about?

13          MR. STRONGWATER:  19.

14          THE COURT:  19.  Okay.

15          MR. STRONGWATER:  In 19, when it talks about the

16  accounting for loss, it's broader than what Mr. Bendelladj is

17  charged with insofar as it talks about both Zeus and SpyEye.

18          And going back to the diagram, it doesn't identify

19  any versions that are assigned to Mr. Bendelladj as he being

20  the one that was a party that caused whatever numbers are set

21  forth in Government's Exhibit 19.

22          When we look at page 2 of the exhibit, we have,

23  again, the loss includes Zeus and SpyEye.  It fails to

24  identify which versions were used by Mr. Bendelladj.  It

25  speaks in terms of actual loss, which is unverified or not

addressed during the three days of the sentencing hearing.  It
doesn't identify victims.  It talks about a -- these bank
losses.

The testimony by Agent Ray is that the total loss
found in this case, the attempted loss was $3.2 million on the
credit cards, and $900,000 actual.  Yet these numbers don't
seem to correlate in any way.

Third --

THE COURT:  All right.  So, you're saying as to --
Agent Ray said attempted 3.2 -- considering everything?  Or in
some other 302?  I'm trying to --

MR. STRONGWATER:  The testimony on the stand was that
-- his report was that there was $3.2 million in attempted
losses on the credit cards.

THE COURT:  On credit cards.

MR. STRONGWATER:  And there was $900,000 actual.

The problem with Government's Exhibit 19 is that
we've had testimony regarding antivirus and MSRT software.
This report does not talk about that.

We also have testimony that there are more than --
there are ample number -- or a large number of free antivirus
MSRT applications in software available on the open market
that doesn't cost anything.  So this $75 per machine is not
consistent with the testimony we've heard in court.

We also don't know -- you know, when we talk about

1  SpyEye's impact on end users, on PCs, yet this report talks

2  about commercial banks.  To rebuild a compromised computer.

3  Well, if we understand how SpyEye works, there is a command

4  and control computer that's owned by the invader and it

5  attaches to botnet and creates botnets that infects PCs.  And

6  that's how SpyEye works.

7      This seems to be talking about what Mr. Kinch is

8  talking about where there is a breach in the firewall and the

9  information has got -- but the important thing about 19 is,

10  one, it's too broad; it doesn't specify any activity by

11  Mr. Bendelladj; three, the paragraph about reconstituting

12  computers is out of line with the testimony that we've heard

13  in court; that there is antivirus and MSRT programs that do it

14  for free and do it rapidly.

15      When we talk about Mr. Patel's declaration, which is

16  Government's Exhibit 25, it suffers the same problems in that

17  it speaks to widespread dissemination of malware by Mr. Panin.

18  It does not.  On paragraph 4, it talks about encounters, it

19  doesn't talk about infections.

20      If there is an antivirus product that blocks the

21  malware, then there is not an infection just by definition of

22  the word block.  If it's quarantined, is that infecting the

23  computer if it's quarantined?

24      If you go to the third verb, remove, we have free

25  antivirus and MSRT products that take it away for nothing.

The largest problem or the most -- the largest deficit in Mr. Patel's exhibit, Government 25, is that it's too generalized. It doesn't speak to cost. And, finally, when you look at paragraph 7, it speaks in terms of instances or reporting conduct between May of 2012, and September 5, of 2015 -- yes, September of 2015.

Mr. Bendelladj was arrested in January of 2013, which means during this period of time he was in custody for 33 months of that total. So, again, to attribute Mr. Patel's numbers to Mr. Bendelladj is -- fails under 1B1.3. And for the other reasons we've stated.

So the government, when it comes to the cost of repairing -- the government is not saying SpyEye caused a loss, as I understand it. The government has been -- the only hard numbers, or the only numbers they've suggested, is that the cost of repair or removal is this exorbitant number because the repair cost times number of computers.

They haven't come to court -- they haven't presented a witness to say because of SpyEye, I lost money. We have no victim statements showing any type of personal loss coming in here. We don't have anybody coming in here and saying my MSRT didn't work and I had to take it to Best Buy and it cost me X number of dollars. And I'm representative of 200,000 people.

So, they've taken this generalized approach and tried to apply it to one small figure of Mr. Panin's overall

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1  operation.  So I don't think the loss number that's suggested

2  for SpyEye -- and, in fact, is not factored into the

3  government's calculation because they are resting solely on

4  the number of access devices -- is relevant or gives the Court

5  much guidance in what is a reasonable sentence for

6  Mr. Bendelladj.

7          The second issue is the credit cards.  And there is

8  -- it's two-fold --

9          THE COURT:  And the second issue is?

10          MR. STRONGWATER:  Credit cards.

11          THE COURT:  Credit cards.  Okay.

12          MR. STRONGWATER:  SpyEye segues into the credit cards

13  because we have asserted in our brief, in our argument, and in

14  our testimony that the credit cards are not part of a SpyEye

15  malware incursion into someone's computer.

16          The government tries to say that there are similar

17  victims.  They are not similar victims.  SpyEye attacks

18  individuals and the "end user" is an expression they

19  constantly use and "PC" is an expression they use throughout

20  the sentencing brief and their presentation.

21          The incursion into 1-2-3 Refills is into a retailer,

22  into a retailer's file server, not an end user or a PC.

23          So the victims in the SpyEye are individuals.  The

24  victim with the credit cards, in that breach, is a retailer of

25  1-2-3 Refills.  The methods are different.  Mr. Kinch set out

1  that use of the term "cookie." The use -- he said that there

2  was a -- I guess my words, a created program that allowed

3  somebody to get through -- probably the wrong word -- a

4  firewall to get into the drawer of 1-2-3 Refills to obtain the

5  information.

6          It was directly from Mr. Bendelladj to 1-2-3 Refills,

7  without the application of spyware. The SpyEye, as described

8  in the brief, in the testimony, requires an individual to have

9  a command and control computer, spreads out to individual

10  computers which are known as bots, creates something called a

11  botnet where they gather information from all these individual

12  end users and PCs, extracts it, and then uses it for improper

13  purposes.

14          THE COURT:  But what do you make of the evidence that

15  Mr. Bendelladj chatted and said he used his bots in order to

16  access and get these credit cards?

17          MR. STRONGWATER:  I think when you read Mr. Ray's

18  affidavit, he defines a bot, basically, as a computer robot.

19  SpyEye requires a botnet, a network of individual computers

20  that are taken over.  So there is -- it's a term of art.  It's

21  not an application.

22          THE COURT:  Well, he's not going to be saying he -- I

23  mean, it -- I would have to get back at the chat again and it

24  may not have said "I use my botnet."  I agree.  But he's

25  obviously using a computer.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1          MR. STRONGWATER:  Yes.

2          THE COURT:  So what does it mean that he says "I use

3   my bot"?  He's not saying I went over there and held them up

4   in order to get this information.  He's bragging about getting

5   it.  "I used by bot."

6          He could be -- isn't it just as reasonable to think

7   more that he was saying "I used..." -- I used my normal

8   devices, which is, I can get into things via my botnet?

9          MR. STRONGWATER:  No.

10         THE COURT:  No.  All right.

11         MR. STRONGWATER:  Okay.  If I could back up a half a

12  step.

13         The government is casting this wide net to say

14  anything involving a computer is cyber crime, and anything

15  involving cyber crime is relevant.

16         There are different types of cyber crime.  There is

17  fishing.  There is sniffing.  There is other types of things

18  to do.  Yes, it is a crime and, yes, it involves a computer.

19  But that doesn't mean that it's relevant.

20         There is, as Mr. Kinch testified, it didn't require

21  malware to access 1-2-3 Refills.

22         THE COURT:  And that may be true; it may not have.

23  But, you know, I could -- I could reach the point of saying

24  it's not a hundred percent clear how he breached it because of

25  Mr. Kinch's testimony, no challenged.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1          MR. STRONGWATER:  Yes.

2          THE COURT:  And I recognize the grounds of it being

3    challenged.  But even if I accept that it was done through a

4    breach method, he was able to identify vulnerability and went

5    in that way, the back door, I mean, why isn't it still an

6    extension of the same type of activity?  He's trying to

7    constantly access private, privileged financial information of

8    individuals and to obtain financial benefit of obtaining such.

9          MR. STRONGWATER:  Let me respond with two points.

10         First, cyber crime is a new arena for me, and you

11   would think that everything falls in the same bushel.  Crime

12   is crime is crime.

13         If we look at drugs as a similar or an analogous

14   situation, one would think well, someone's importing pills

15   from Canada and heroin from Mexico, it's all one event.  They

16   are trying to deal in drugs so does it really matter what the

17   substance is?  They are all bringing it in.

18         And we cite the Court to *United States versus Gomez*

19   at 164 F.3d 1354, Eleventh Circuit opinion decided in 1999,

20   where the Court, the Eleventh Circuit reversed, saying that

21   the two different drug events were not part of the same

22   conspiracy and it was err to merge them.

23         The other is a little thornier and might elicit a

24   groan but, to me, the difference between going into 1-2-3

25   Refills through a cookie, through the back door as the Court

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

just said, versus writing SpyEye, a malicious software that
goes through a command and control computer, that goes to an
end user to herd a bunch of bot, to create a botnet and herd
that information and bring it home, yes, both might involve
computers.  But, this is my example.

If we talk about growing crops.  If someone is
growing apples in Vermont in an orchard, and someone is an
oranges grower in Florida, yes, they are both growing fruits,
but are you saying that, yes, they are both growing things,
both are fruits, and therefore they should all be lumped
together?

Just because it's a fruit and just because it's going
to be marketed and just because it's going to be sold to the
same population, doesn't mean that the two things are relevant
to each other.

In this case you have, yes, you have an unauthorized
intrusion through a command and control to reach an
individual's PC.  On the other hand, you have a direct entry
without malware, without having any infection -- basically,
you're just figuring out how to get into someone else's
computer by a user name which may be generally available.

The bottom line is that, yes, they may have asked
Mr. Kinch questions and said, hypothetically, could it have
been through malware?  And, hypothetically, yes, it could have
been.  But in Mr. Kinch's analysis of information as available

through discovery, his opinion it was not done through malware.  It was done through a defect in 1-2-3 Refills' programming that allowed an outsider to get in there.

So, yes, they are getting information but, no, the techniques are different, the victims are different.  And the third criteria --

THE COURT:  Well, the victims are somewhat different. If you're saying it's 1-2-3 Refill, but the victims are still individuals with accounts.  I mean, we're always going to have -- if we really are only looking at the same victims on these cases, that would be hard when there are so many different people who are affected.  And it's not just the bank, it's their customers.

MR. STRONGWATER:  When we talk about bank fraud, we are talking about individual banks.  We don't look to see the number of accounts that that bank has to say that those people are victims because the bank has suffered a certain amount of loss.

And, again, the bottom line is --

THE COURT:  Well, all I'm saying is we're not running around here saying it's only Deutsche Bank, or it's only Bank of America.  We're saying the same victims are, by virtue of having different banks, but they are still the same nature of a bank.  Unless you're telling me that's not right.

MR. STRONGWATER:  No, there is always going to be, as

1  you work your way down the line, there is always going to be a
2  similarity of victims.

3      THE COURT:  All right.  All right.  Well --

4      MR. STRONGWATER:  Quite frankly, in this case, they
5  haven't identified any victims other than through IP addresses
6  as having been affected by SpyEye.  There is no overlap
7  between the SpyEye component of the government's case and the
8  1-2-3 Refills component of the case as far as overlap of
9  victims or similarity of victims, other than the fact that
10 they are individuals.

11      Just to conclude that part, as far as relevant
12 conduct, I think the government has the burden of proof and
13 you're dealing with alternative possibilities.  And I think
14 alternative possibilities creates a tie, and the tie goes to
15 Mr. Bendelladj.

16      The third component, as far as relevant conduct,
17 would be the timing.  The timing is that we know that
18 Mr. Bendelladj -- what they call pwned -- broke into
19 Mr. Panin's SpyEye and put it out in public for free,
20 basically defeating any type of interest Mr. Panin had in
21 developing SpyEye.  And he was frozen out by Mr. Panin.

22      We know that the video was placed in April, I
23 believe, as set out in our sentencing memo.  When the video
24 was done and substantially at a later point in time,
25 Mr. Bendelladj went into 1-2-3 Refills.  So we have a break in

1  time.  They're not happening concurrently.

2        THE COURT:  The video's when he cracks it?

3        MR. STRONGWATER:  Yes.

4        THE COURT:  And he's showing everyone he cracked it?

5        MR. STRONGWATER:  Yes.

6        THE COURT:  And that's in April?

7        So, you're saying -- I thought it was a little bit

8  different.  You're saying his break with Mr. Panin is in

9  April?  Or earlier?  I'm a little --

10        MR. STRONGWATER:  I think it --

11        THE COURT:  I thought you said before it was in

12  February.

13        MR. STRONGWATER:  I think Mr. Panin, in his

14  statement, says it happened before -- let me just say it this

15  way.  In April of 2011 is when Mr. Bendelladj posted a video

16  showing how you can get SpyEye for free, with the title being

17  watch out, SpyEye cracked, my own version SpyEye.  An earlier

18  title was SpyEye last version pwned, p-w-n-e-d, which means

19  owned or dominated, which we believe showing that

20  Mr. Bendelladj was not cooperating with Mr. Panin but was in

21  fact trying to thwart or just being a little impish or a

22  prankster, and trying to defeat someone's summation of

23  malware.

24        THE COURT:  No, he just wanted to do his own version.

25  Didn't he?  He might have wanted, basically -- I'm not going

1  to be tied to Mr. Panin, I'm going to sell it on my own or

2  even if it's for cheap, I mean, I'm having fun.

3        MR. STRONGWATER:  I'll accept the second half.

4        THE COURT:  All right.  Well, whatever.  But the

5  point is is that it's not like he stopped selling SpyEye.  He

6  just did his own version.

7        MR. STRONGWATER:  I don't know whether he ever sold.

8        THE COURT:  All right.  He might have given it away.

9  But he gave it away, and people would be buying his add-ons to

10  it.

11        MR. STRONGWATER:  Again -- so, each version would

12  terminate the earlier ones.  There is no -- there is no dollar

13  -- there is no -- there's chats regarding his activity.  There

14  is no evidence of sales, dissemination or monies received

15  post-video where he's saying he has cracked it and Panin --

16  that's when Panin starts putting the tags on so you could

17  trace the versions.

18        THE COURT:  Exactly.  You're saying that's -- he

19  didn't do it originally?

20        MR. STRONGWATER:  I don't know whether we introduced

21  or we went through his -- we know that he was cut off.  I'm

22  looking for that.

23        THE COURT:  I'm not disputing the fact that he was

24  cut off.  All I was trying to -- you just said, though, that

25  Mr. Panin started putting the names, embedding the names of

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1 the people he distributed to at that time.  And I just -- I

2 guess I gathered that it was right from the start.

3        MR. STRONGWATER:  I think it is.  The paragraph, the

4 statement is Panin embedded owner I.D. to SpyEye because Bx1

5 was able to crack a portion of the SpyEye code.  To detect who

6 is responsible for future cracks, Panin added an identifier to

7 tie a given SpyEye client to a specific instance of SpyEye he

8 sold.

9        THE COURT:  Where is that from?

10        MR. STRONGWATER:  This is the 302, dated October 8,

11 2013.  I don't recall whether we asked Agent Ray about it, but

12 I'll be glad to tender 302.

13        THE COURT:  Okay.  All right.  Well, you can tender

14 it.

15        MR. STRONGWATER:  The statement goes on, once he,

16 Panin, confirmed Bx1 was the one who cracked the portion of

17 SpyEye, Panin banned Bx1 from the SpyEye client list.

18        So that's our basic argument about relevant conduct.

19        And I would like to proceed.

20        THE COURT:  All right.  Why don't you just go ahead

21 and offer that document.

22        Are there any objections?  Do you want to see it,

23 Mr. Grimberg?

24        MR. GRIMBERG:  I would like to see it.

25        There are no objections if it's filed under seal.

 1          THE COURT:  Okay.  We will file it under seal, then.

 2          MR. STRONGWATER:  Yes.

 3          COURTROOM DEPUTY:  What should it be marked as?

 4          MR. STRONGWATER:  What letter am I working on?

 5          COURTROOM DEPUTY:  You're on B.  Is it 12.  B12.

 6          MR. STRONGWATER:  Judge, irrespective of whether the

 7 Court finds that the 1-2-3 Refill information was relevant or

 8 not, I think it's incumbent upon me to address the numbers.

 9          THE COURT:  All right.

10          MR. STRONGWATER:  First, there seems -- there has to

11 be -- the Court, yesterday -- Monday, the Court said there had

12 to be a stop on numbers.

13          Yes, we received Mr. Ferber's letter talking about

14 80,000.  But we have an email from -- an internal email from

15 Agent Ray to prosecutors talking about 80,000 thefts, which

16 postdates Mr. Ferber's letter.

17          We have the sentence -- so that was at 80,000.  We

18 have the 302 that fell in between the email and -- I'm sorry.

19 We have 302 that fell between Mr. Ferber's letter and

20 Mr. Ray's email.  302 also talks about 80,000.

21          THE COURT:  I thought Mr. Ray's -- you're talking

22 about Agent Ray's 302 that you reviewed yesterday?

23          MR. STRONGWATER:  Yes.

24          THE COURT:  Okay.

25          MR. STRONGWATER:  So, again, we have Ferber in 2013.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1  We have the 302 in 2014, and the email in 2015.  All --

2          THE COURT:  I'm not sure what the 2015 is, what

3  you're saying.

4          MR. STRONGWATER:  We have -- there was an email -- do

5  you have that exhibit?  Yes.  Exhibit B11.

6          THE COURT:  Oh.  All right.  I'm not sure, then,

7  which is the 302 you're talking about, then.  I've seen B11, I

8  admitted yesterday.  But I'm not sure what 302 is that you're

9  referring to.

10          MR. STRONGWATER:  302 was an earlier exhibit, where

11  Agent Ray testified about 1TXT and 2TXT and reduced it down to

12  53,000, redirecting, saying that that was a mistake.  My

13  53,000 was just 1TXT.  And his total in that 302 was 80,000 --

14  was the 83,000 number.

15          THE COURT:  All right.  Well, you can give me the

16  number later.  I need to look at it.

17          COURTROOM DEPUTY:  One or two?

18          THE COURT:  Just give it to me later.  There is only

19  so much I can absorb at this moment.  I mean, if you don't

20  have the numbers, then what I'm hearing, you can give it to me

21  at the end.

22          MR. STRONGWATER:  I apologize.

23          THE COURT:  That's all right.

24          MR. STRONGWATER:  So, we have a three-year span of

25  time when they're talking about 80,000.

1       Mr. Grimberg wants to go into aggravating

2  circumstances, that Mr. Bendelladj didn't plead guilty, he

3  didn't do that.  Well, I think a fair reply, the offer was for

4  Mr. Bendelladj to accept 200,000 as the credit card number, to

5  say that the guidelines were reasonable and to rely on the 5K

6  as the only way to get down from a 360 to life sentence.  And

7  that's why it was rejected.

8       There was negotiations.  You know, for whatever

9  reasons, negotiations broke down.  Either by misunderstanding

10 between the parties about whether there was any give, whether

11 there was any misunderstanding about our respective view of

12 the case but, the terms that were offered to Mr. Bendelladj

13 were too harsh to accept because it left his entire fate in

14 the government's hands based on a 5K.

15      And that's just -- I would not have brought it up.

16 Mr. Grimberg was trying to say that Mr. Bendelladj is not

17 remorseful because he has taken this.

18      Nevertheless, when the government filed its

19 sentencing memo on March 2, of this year, on page 2, they talk

20 about 200,000 credit cards.  The heading on page 20 is

21 Bendelladj theft at 200 credit cards.  Heading on page 22 is

22 Bendelladj's threat -- theft, 200 credit cards constitutes

23 relevant conduct.

24      And a comment on page 25, the government says even if

25 Bendelladj's theft of 200,000 credit cards were not part of a

1  common scheme...

2         Nowhere in the government's sentencing brief of March

3  2 do they mention Exhibit 41, which are the entries from

4  France; nowhere in the government's sentencing brief, as late

5  as March of this year, does the government represent that

6  there is more than 200,000 credit cards that should be

7  attributed to Mr. Bendelladj.

8         I think we have discussed -- perhaps to the extent we

9  tried the Court's patience -- regarding what Exhibit 41, the

10  French item's entries are.  There is 300,000 plus there.

11  Agent Ray is not a banking expert.  He is relying on something

12  that another FBI agent from out of the country learned from

13  another person who is not associated with any United States

14  law enforcement agency.

15         We don't know any of the entries on that listing.  It

16  doesn't match standard United States credit card coding,

17  having 15 or 16 digits.  It doesn't match -- or, Mr. Ray is

18  unable to testify that any of the other numbers are associated

19  with bank accounts as organized in structure under the French

20  protocol of IIBN.

21         THE COURT:  Of?

22         MR. STRONGWATER:  IIBN.

23         MS. STRONGWATER:  IBAN.

24         MR. STRONGWATER:  It's the French equivalent of the

25  IINS protocol that the United States has of credit cards and

1  bank accounts.

2          So, it's in addition to anything that's been

3  presented up through March of 2016, I suspect the government

4  will say, somewhere in the four terabytes of information given

5  to us, we would have found it.

6          THE COURT:  Well, I don't know what happened to the

7  files, on the other hand -- I think you might have, and I have

8  concerns about the French data and I'll say that.  But, on the

9  other hand, just when you're saying -- and I understand there

10 is a problem when you have eight terabytes of data, but I have

11 no reason to believe as to the eight other files that Agent

12 Ray just concocted the data in that.

13         MR. STRONGWATER:  And I will address that in a

14 second.

15         THE COURT:  All right.

16         MR. STRONGWATER:  So, without belaboring the issues

17 of the French accounts, I'll address the question about the

18 eight other files.

19         Because of the back and forth yesterday, I'll state

20 in my place, Mr. Kinch did review the grabber file or did

21 review the evidence, and has found an additional 5,317 --

22         THE COURT:  5,000 what?

23         MR. STRONGWATER:  317 entries.

24         MR. GRIMBERG:  Objection, your Honor.  The record is

25 closed.  I mean, he wants to take the stand and reopen the

1  record now?

2  THE COURT: Well, you entered --

3  MR. GRIMBERG: You didn't allow us to bring in things

4  that happened since the last sentencing. You're going to

5  allow stuff that happened last night? That's ridiculous.

6  THE COURT: He is stating in his place. I allowed

7  you to enter the "Newsweek" article.

8  MR. GRIMBERG: As to a 3553 factor. Not evidence of

9  what an expert has done last night to supplement the record.

10  We object.

11  THE COURT: Why is it, Mr. Strongwater, why didn't he

12  look at this before, I guess, is what my question is?

13  MS. STRONGWATER: I have an answer. Those files they

14  talked about are unidentified even as presented --

15  THE COURT: All right, you've got to speak more

16  slowly, Ms. Strongwater, and you've got to --

17  MS. STRONGWATER: Mr. Kinch still doesn't know what

18  the files are. He removed every single file, all 19 of them,

19  and only found the extra 5,000. We don't know what eight

20  files they're talking about.

21  MR. STRONGWATER: We are just stating in our place

22  and we're going to concede that these other files contain the

23  5,300 additional entries.

24  I would also state in my place, to the extent I'm

25  permitted, that those haven't been cleaned up as far as things

1   that we were talking about yesterday as far as certain of

2   categories.

3           But we are conceding at this point that there is --

4   that there are cards in those additional files.  Why we didn't

5   present it in our sentencing memo from March, or why we didn't

6   address it yesterday in our testimony, obviously, it's a

7   shortfall.

8           THE COURT:  All right.

9           MR. STRONGWATER:  But to Mr. Kinch's credit, and to

10  the detriment of Mr. Bendelladj, Mr. Kinch did say that he did

11  find in excess of 80,000 entries that are unique in 1TXT and

12  2TXT.

13          So a floor at this point would be the 80,000.  Our

14  dispute with the government, without re-- on relevance, but

15  independent if the Court finds it relevant and wants to

16  consider it, I think our best number is the 80,000.

17          When we look at the 80,000, however, it includes

18  cards that had expiration dates prior to the date

19  Mr. Bendelladj acquired them.  On the sample of 1TXT, which I

20  believe is Government's Exhibit 37, that sample showed that 70

21  percent of the 150 entries had expiration dates predating

22  December of 2011, the date of the breach of 1-2-3 Refills.

23          THE COURT:  But the testimony was -- and I have to

24  say, this is somewhat consistent with my experience, that

25  while many might have their cards not honored if they had an

1  expired date, it's not that sometimes those in fact aren't

2  honored.  I don't know what percentage.

3        MR. STRONGWATER:  And that's -- yes.

4        THE COURT:  I don't know what percentage, and I don't

5  know whether somebody can do something with the identifying

6  information even if it's an expired card.  That's another

7  question.

8        MR. STRONGWATER:  Yes.

9        THE COURT:  But they have some value is what -- is

10  the way I have perceived what the testimony is.  How to

11  quantify that is another matter.

12        MR. STRONGWATER:  Correct.  And I think we gave -- I

13  don't want -- we gave the Court and the government a case

14  where it was something where the thefts occurred prior to the

15  defendant's acquisition of the cards.  The Court used the

16  guideline number of $500 for the card, but because -- this was

17  the *Morales* case -- but because so many transactions occurred

18  before acquisition, the Court departed from --

19        THE COURT:  It varied.

20        MR. STRONGWATER:  Yes, it varied.  And used the

21  acquisition date versus the actual use date as a basis for

22  variance.

23        THE COURT:  All right.  All right.

24        MR. STRONGWATER:  And I think it's an analogous

25  situation where you have up to a 70 percent shortfall of

active cards. We also cited the Ninth Circuit case saying
there was the usability issue. And with the CVV codes or the
account numbers which are lacking at a 20 percent rate from
the sample on Exhibit 38, which is 2TXT, with that type of --

THE COURT: The CVV numbers were missing in 20
percent?

MR. STRONGWATER: The comment one or both -- one or
the other, or both --

THE COURT: CVV or what?

MR. STRONGWATER: Account numbers.

THE COURT: Account numbers.

MR. STRONGWATER: On the sample of 2TXT, which is
Exhibit 38.

THE COURT: All right.

You've been going for a while and I don't know if
it's because of Mr. Grimberg, but ... keep going.

MR. STRONGWATER: So, to wrap up the second point
referring to cards, I think the lowest number we can present
to the Court is the testimony of Mr. Kinch that there is
approximately 80,000 plus cards from 1-2-3 Refills. We stand
on our testimony and our briefs regarding anything outside of
that.

THE COURT: I'm sorry. 40? 80,000 plus?

MR. STRONGWATER: 80,000 -- it's --

THE COURT: You meant 80,000 plus? A little bit

1 plus, is that what you mean?

2      MR. STRONGWATER:  Yes.  No more than -- I think his

3 testimony was 80,300 and change.

4      THE COURT:  All right.

5      MR. STRONGWATER:  If you accept my proffer, we come

6 up to 85,000 credit cards.

7      I think I've addressed -- that wraps up the

8 discussion of SpyEye and the credit cards.

9      On 3553, we sort of worked our way into that, talking

10 about the rate or percentage of the sample that don't meet

11 Agent Ray's and the government's definition of fulls.

12      Again, I think the number of cards, acknowledging

13 what the Court has said, that there is -- the Court attributes

14 some value or some worth to the cards with and expiration

15 dates, or without account numbers, or without CVVs, it still

16 overstates the dollar figure that's attributable to

17 Mr. Bendelladj.

18      As Agent Ray testified, again -- I'm sorry to repeat

19 myself -- there was $3.2 million of attempted loss.  When

20 Mr. Grimberg talks about the multitude of individuals who were

21 victimized, we have a concrete number.  We have a concrete

22 number of $3.2 million in the reports that we were given in

23 discovery, that each bank identified the number of people,

24 number of accounts affected.

25      We have an actual loss --

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1        THE COURT:  We're just talking about credit cards,

2   right, at this point?

3        MR. STRONGWATER:  Yes.  We have 3.2 million attempted

4   and 900,000 actual.  We think those are numbers that got the

5   Court to a reasonable sentence.

6        The government has speculated about pecuniary gain.

7   Agent Ray knows of no jumps.  He knows of no money mules that

8   were working for Mr. Bendelladj.  Cash flowing to

9   Mr. Bendelladj is virtually nonexistent.  It's de minimis, at

10  best.  So to say he had pecuniary gain is an overstatement and

11  speculation.

12       We heard the expression ripper from Agent Ray.

13  That's what Mr. Bendelladj is.  He undoes --

14       THE COURT:  That's a much better microphone than the

15  other one.

16       MR. STRONGWATER:  We've been talking about Dark code,

17  and we talked Dark code is where someone builds his

18  reputation.  This would often present letters of

19  recommendation.  These are letters that -- comments that

20  deprecate Mr. Bendelladj.

21       There is a comment by Mafi, Bx1 has always been a lab

22  guy that bragged a lot about his things.  No wonder the feds

23  got to him eventually; I'm just surprised it took them five

24  years.  They say he was always talking BS, like, always.

25  That's from Genadi, G-e-n-a-d-i.

1          Genadi later says, rather than Bendelladj or Bx1

2   being someone who is respected within Dark code, says what a

3   rat.  Symlink was a cool guy.  Blank Algerian Kid destroyed

4   them just for fun and profit.  Hang that MF.  He leaked web

5   index to others.  And I guess FBI will -- something -- to him

6   for leaking Zeus and source as well.

7          So he was not a respected individual on Dark code.

8   He was more of a -- using Agent Ray's vernacular, a ripper,

9   trying to interfere with other people's malware and cyber

10  crime.

11         Mr. Bendelladj was arrested in Thailand when he was

12  traveling with his wife and minor child from Malaysia, where

13  he was living, to his expected destination of Egypt for a

14  vacation.  He has only been to three places in the United

15  States.  Lovejoy Detention Center, the United States

16  Penitentiary, and this courthouse.

17         When he is through with his sentence, he will be

18  deported to his country of citizenship, which is Algeria.

19         In light of Exhibit 41, he may be extradited to

20  France, or some of the other European countries that the

21  government has identified where this malware was in place.

22         He does have a job.  At paragraph 105 of the

23  presentence report shows that he was a programmer in Malaysia

24  getting a modest salary.  The government has not been able to

25  come forward with any type of proof of a large bank account,

acquisition of assets or any type of wealth on his part other

than his bottom line salary that he was getting as a worker.

The Court asked yesterday to address comparable

sentences.  We've tried to work on it.  One of the problems is

having access to the core information that makes up these

other cases.

I think, in my research, this is the first one where

a defendant has had a full-blown challenge to the numbers that

the government has asserted.  The numbers that we've seen in

all these other plea agreements and all the other cases that

are set out in our sentencing memo, they are the result of

negotiated pleas, where the numbers are refined and put

forward.

Nevertheless --

THE COURT:  Well, I read your sentencing memo.  If

you're just going to go over those.

MR. STRONGWATER:  No, I don't plan to do that.

THE COURT:  All right.

MR. STRONGWATER:  I do want to say that we have an

article -- we talk about general deterrence.  With general

deterrence, we have articles that Citadel is still up and

running, even though the author of Citadel has been sentenced.

We have a "60 Minutes" story last Sunday, where CBS

goes to this hacking group in Germany, where they ask them to

show CBS how they can hack.  And under a controlled

environment, they get into the reporter's cell phone, even
though the screen is blank, and they can use the camera on the
phone. They go into a congressman's cell phone and record his
conversations.

THE COURT: All right. I don't doubt that hacking is
a way of life in the world. I'm not sure that that tells me
anything.

MR. STRONGWATER: Well, as far as deterrence, putting
Mr. Bendelladj away for a long period of time is not general
deterrence.

THE COURT: Well, I would -- I understand that. I
understand that.

MR. STRONGWATER: Okay. I won't belabor it. I
apologize.

THE COURT: I understand your point, and we could say
the same thing in a complex way about many other fields of
criminal endeavor.

MR. STRONGWATER: Yes. It's continuous. But the
concept of general deterrence is, while some people may think
it's deterrence, other people may take it as an opportunity.

Judge, if you would allow me to do something out of
turn, for Mr. Bendelladj to address the Court, then I can make
sure that I have addressed everything.

THE COURT: Yes. What are you recommending as a
sentence?

MR. STRONGWATER:  Judge, we believe a 66 month
sentence would be fair and reasonable based on the loss found
by the banks of $3.2 million.  Mr. Bendelladj, as we said, has
already spent time in custody in Thailand, four months, before
being extradited to here.  The conditions in Thailand are not
as nice under -- even compared to Lovejoy.

THE COURT:  Was that under federal custody by virtue
of the fact that he had been arrested?  I'm just trying to
figure out --

MR. STRONGWATER:  Yes.  He was arrested by the FBI
with the assistance of the Thai authorities.  It took four
months to get Mr. Bendelladj from Thailand to here.  He did
not contest extradition.

THE COURT:  All right.  But he was arrested pursuant
to a federal warrant?

MR. STRONGWATER:  Yes, yes.

THE COURT:  All right.

Mr. Bendelladj.

DEFENDANT BENDELLADJ:  Good afternoon, your Honor.
Thank you for giving me this opportunity to explain myself.  I
would like to address an issue, if that is possible?

THE COURT:  You can address anything, but if you're
going to go into the merits of something, I would ask you to
be sure to have a talk with your attorney in advance.

THE DEFENDANT:

1    DEFENDANT BENDELLADJ:  Okay.  All right.

2    THE COURT:  I don't know about it, so he knows that

3  that's what you're planning to address.  Because if I'm going

4  to start hearing factual evidence, I just want to make sure

5  that it's counseled.

6    DEFENDANT BENDELLADJ:  Okay.  Your Honor, this case

7  is about SpyEye and obtaining information with SpyEye.

8    Yesterday, the district attorney says that this case

9  is about obtaining information using unauthorized access.

10  But, in fact, this case is obtaining information using

11  unauthorized access with a software called SpyEye.  So this

12  case is all about SpyEye.  It's not about -- it's not about

13  vulnerabilities.  It's not about malware.  Not about any,

14  anything --

15    THE COURT:  All right.  Well, that's really a legal

16  issue.  So I think it would be more useful for you to address

17  -- tell me something that you want me to know about you

18  personally.

19    About whether any -- you know, any regrets you have;

20  why you fell into doing this.  Anything like that.

21    And I'm not prohibiting you from talking about

22  anything else but, to hear argument about what the case is

23  really about, that's what I charge your attorney with telling

24  me about.  And I think he has made that argument on your

25  behalf.

1        DEFENDANT BENDELLADJ:  All right, your Honor.

2        Previously the district attorney said that I hate

3   America, and that I wasn't cooperative and I wasn't helpful to

4   them.  Well, your Honor, it's impossible for them to open my

5   computer.  They cannot decrypt it.  It is impossible, but I

6   have cooperated with them and gave them my passwords on the

7   first date.  I haven't hesitated or, like, wasn't being

8   cooperated with them.  Even I waived my right on the

9   extradition.

10       So his -- by him saying that I wasn't cooperative,

11  that is totally wrong.  And saying that I hate America, he

12  don't know what I have in my heart.  I don't hate nobody.  I'm

13  just a normal person.  I love every person like I love myself.

14       Another thing, your Honor, I do -- I do accept what

15  he said that I am arrogant.  Yes, true, I am arrogant.  That's

16  why I am here.  If I was listening to people and they tell me

17  don't do that, don't do that, I wouldn't be in this situation.

18       It is just my arrogance and my ignorance that's what

19  put me in this situation.  If I was a person that listened, I

20  wouldn't be here.

21       Another thing is I have learned more than my lesson.

22  I have a child, I have a family to take care of.  I have been

23  in custody for a long, long time and I do regret what I have

24  done.  I know it was wrong.  And I assure you, your Honor, it

25  won't happen again.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1     It's not that I'm in another country that I be safe
2 or all -- or anything else.  I would get arrested, one way or
3 another.  It's impossible to say a person that he will not be
4 arrested or he will do that.  I assure you, it won't happen
5 again.  I learned more than my lesson.
6     I have been in custody for 40 months now.  I went
7 through terrible times, especially in Thailand.  In Thailand,
8 I didn't have a mattress to sleep on.  I was sleeping on the
9 floor.
10     And -- and, also, like I said, your Honor, I do
11 regret what I have done.  I will not do it again.  I assure
12 you that.  I won't even engage in any computer activity at
13 all.
14     This is my words.  And I'm sorry for everybody who
15 get harmed by my actions, and I'm sorry that I did not
16 cooperate with the government.  It's not that I didn't -- I
17 wasn't willing to cooperate with them.  I was willing to
18 cooperate with them if we had -- if we reach an agreement.
19     I -- previously, when I had my previous attorney,
20 Demme Martinez, he discussed with the previous district
21 attorney about the terms of me aiding them and everything
22 regarding that.  And I explained for them what I would do to
23 them and what I will do to the government and everything.  But
24 the government wanted me to accept things that is not fair.
25     Because agreement has to be between two people.  I

have to agree for it, and they have to agree for it.  And
since they did not agree on my terms, I can't agree on their
terms because their terms is -- it's extra -- it's not good.
It's a lot.

THE COURT:  I think I've heard enough about the
cooperation issue.

DEFENDANT BENDELLADJ:  Okay.  Your Honor, I have a
child.  He is now five years old.  I -- last time I seen him,
before I was detained, he was 20 months old.  I miss him so
much.  I miss my family.  My family depends on me.  My wife,
now she is working two jobs just to keep up with everything
there.

I haven't -- my mom passed through terrible time
especially because of this case.  Probably you have seen it on
TV, if you are watching the news.

And I deeply regret what I have done.  I deeply --
I'm sorry for all the victims.  I'm sorry for everything.  I'm
sorry for all this harms that I have caused to them, whether
they are here or they know me or they don't know me.  I'm
sorry for that.  That won't happen again.

And also, your Honor, I'm young.  I would just like
to move on with my life.  I don't want to ... it's so hard to
explain.

I just, your Honor, just be fair with this case and
it won't happen again.  I assure you that.  I am sorry for

1  everything.

2          THE COURT:  Thank you, very much.

3          DEFENDANT BENDELLADJ:  You're welcome.  Thank

4  you, very much.

5          MR. STRONGWATER:  Your Honor, just one P.S. -- I

6  think just one P.S.  Mr. Bendelladj's family has been

7  victimized in a way that the Middle Eastern blogs and

8  newspaper accounts falsely state that he has been hung and

9  caused a lot of anxiety for the family and trying to

10  straighten that out.

11          The blogs and the newspaper reports also falsely

12  report that Mr. Bendelladj, one, has garnered a great deal of

13  money and, two, is assisting Palestinian terrorists with that

14  money.

15          Now, Mr. Bendelladj is here, he is isolated from

16  that, but his wife and mother have been communicating with us

17  that they want to know the truth and how can they disseminate

18  what's happened?  And perhaps the sentencing today will rebut

19  most of those false rumors.

20          THE COURT:  All right.  Is there anything else you

21  wanted to say?

22          MR. STRONGWATER:  I don't believe so.  If I could

23  check, one second.

24          No, your Honor.  That would conclude our remarks and

25  I will remember to return all the Court exhibits to you.

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1          THE COURT:  Okay.  Because I wanted to look at a few

2   of them when we break.

3          MR. GRIMBERG:  Your Honor, may I have a few minutes?

4          THE COURT:  Yes.

5          MR. GRIMBERG:  We've been going a while so I'll be

6   brief.  Just a couple of points.

7          First, with regard to the antivirus program, the idea

8   that this somehow mitigates the harm, I just want to point out

9   that communicates a misunderstanding of what antivirus

10  programs do and what they don't do.

11         A virus, whether it is -- whether an antivirus

12  program is on the computer or not, the computer is never the

13  same having been infected with a malware.  Even if the

14  antivirus program can remove all or some of the virus, the

15  computer has been infected.

16         It's to your analogy of getting the flu, you're never

17  -- you don't just spring up and you're 100 percent integrity

18  protected computer the next day.  The computer is impacted.

19  And we have attempted to monetize that harm at $75 because the

20  computer has been impacted.  It's difficult to quantify, I

21  recognize.

22         But, also, we also want to point out that when we're

23  talking about guidelines, sentencing guidelines, we're not

24  talking about actual loss.  We're talking about attempted

25  loss.  And whether or not a computer has an antivirus program

1  is beside the point for purposes of sentencing.

2          The attempt was to infect this many computers, and

3  the attempted loss represented the infection of that many

4  computers.

5          Again, it's just an estimate.  It was not meant to be

6  exclusive and we're not suggesting it was actual harm but, for

7  sentencing purposes, as the Court is well aware, we look at

8  attempted harm.  And the fact of the proclivity of antivirus

9  programs should not factor into the analysis at all for

10  guideline purposes.

11          With regard to relevant conduct, your Honor,

12  Mr. Strongwater went on for a very, very long time without --

13  and the presentation during the hearing was trying to

14  distinguish between SpyEye and other types of malware.  I'm

15  not aware of any legal authority in which we could parse out

16  relevant conduct in that way.

17          These were computer intrusions for the purpose of

18  stealing personal and financial information.  There is

19  absolutely no legal authority to suggest that the relevant

20  conduct damage should be defined by a particular type of

21  malware, or even malware at all.  It is computer intrusion.

22  However means.

23          Again, with the bank robbery analogy.  You wouldn't

24  separate out a bank robbery that was used -- that used a gun

25  versus a bank robbery that used a machete.  Same thing.  The

means by which the computer intrusion was done is beside the
point.  It was all for a common purpose, a common plan, a
common modus operandi.  And that was to steal personal and
financial information.

To the extent that the Court is going to look at
Mr. Kinch's testimony and analysis, I want to remind the Court
of the points that were drawn out on cross-examination.

Number one, Mr. Kinch was not even aware of the
functionality of SpyEye.  He did not know that SpyEye had the
capability of stealing cookies, cookie vulnerabilities from
computer servers.  So he testified and based his analysis on
the idea that this breach occurred through a cookie
vulnerability, not even knowing that the very malware for
which his client was convicted has the capability to do just
that.

He acknowledged that --

THE COURT:  All right.  I really heard Mr. Kinch's
testimony and your very thorough cross-examination of him.  So
I don't need for that to be reviewed with me at this juncture.

I think what is more helpful and you want to talk
about, trying to get me back to what the basis upon which
Agent Ray testified that he felt fairly confident or totally
confident that it was not a breach through a -- that it was
really SpyEye that did it.  And if you want to talk about
that, that's probably more useful.

MR. GRIMBERG:  Yes.  I think Agent Ray's testimony was that there was of indication that malware was used.  We can't say that it was SpyEye in particular.  We -- the indication was that it was consistent with the use of malware to breach into the 1-2-3 Refills.net server.  Our overall key point is what I said at the beginning, it doesn't matter.  It doesn't matter whether it was malware; it doesn't matter if it was a direct hack.  It doesn't matter.

THE COURT:  Does it matter that for purposes of this case that Mr. Bendelladj may have completely severed his connection with the original Panin conspiracy?

MR. GRIMBERG:  No.  Again, because, first of all, it was not, as the Court pointed out, it was not what we know it as the noisy withdrawal.  It was not cutting off the conspiracy and disassociating himself.

It was continuing his activity on his own.  He branched out and sort of franchised himself to break the code and keep distributing it out.  He continued the same course of conduct.

The case law is very clear that for sentencing purposes you don't look just to the four corners of the conspiracy.  You look at the criminal conduct of this particular defendant.  This defendant engaged in a conspiracy with defendant Panin to promote and distribute SpyEye.  Even if they had an acrimonious -- developed an acrimonious

relationship at some point, that conspiracy was still
continuing because Mr. Bendelladj was continuing to promote
and distribute SpyEye and all the malware.  Promote it to
others, use it himself, sell credit cards, breach into
computer systems.  He was doing it all.

And our view, primarily, is that this was still
continuing the conspiracy because he was continuing to promote
and proliferate SpyEye.  But even if the Court doesn't agree
with that, again, it doesn't matter because it was all
relevant conduct.  It was all for the purpose of intruding
into computers for the purpose of stealing personal and
financial information.

The last point, your Honor, is with regard to the
access devices and the account numbers.  Again, I won't
reiterate the point that these were just samples and meant to
extrapolate, this was not the total universe of cards.  These
13 files, 13 or 3,000 and there were many, many other account
numbers on Bendelladj's computers, four terabytes of data.

But, again, look into those cards.  To the extent
that Mr. Strongwater relies on the fact that they were expired
or and the filters that were used to remove cards simply
because they didn't have a zip code or a full address, or
whatever the case may be.  That's not the standard.

The standard is defined by statute as an access
device, it's under 18 U.S.C. Section 1029(e)(3).  And it

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

defines an unauthorized access device as any access device
that is lost, stolen, expired, revoked, canceled or obtained
with the intent to defraud.

So the fact that these cards may have had expirations
that preceded their finding, the fact that they were used more
than once, that's not the standard. It's an access device
that was used with the intent to defraud.

And even if it has an expired card, it doesn't fall
outside the rubric of an access device for purposes of the
statute for which this defendant pled guilty.

THE COURT: Thank you.

MR. BUKH: I need 20 seconds.

THE COURT: Of course. I didn't drag you down here
from New York for nothing.

MR. BUKH: The prosecutor is requesting an upper
guideline on the plea.

As my cocounsel specifically points out in the
conclusion portion of the final sentencing memorandum, Mr.
Panin did not violate the plea agreement. Mr. Panin
respectfully requests that the Court impose a nonguideline
sentence, no more than the time already served.

And, by the way, he has already served almost three
years, 34 months. So this sentence would be sufficient, but
not greater than necessary to achieve the goals under 3553.

That's it.

1          THE COURT:  All right.  I would like to excuse

2   Mr. Bendelladj and his counsel so I can hear any other motions

3   that might be just -- I want to just talk to you for a moment

4   about your motion.

5          MR. GRIMBERG:  Your Honor, could we have a

6   five-minute break before that?

7          COURTROOM DEPUTY:  Are you excusing Bendelladj to go

8   downstairs?

9          THE COURT:  Yes.  For lunch.

10         MR. STRONGWATER:  When would you like us back?

11         THE COURT:  Do you really need five minutes?

12         MR. GRIMBERG:  I need a file.  I need to run

13  downstairs to my office and come back up.

14         THE COURT:  Do you need anything that we might have?

15         MR. GRIMBERG:  If you have a copy of the motion.

16         THE COURT:  I do.  We can print it.  All right.

17         It's going to be, Amy, do you think it's safe to say

18  2:10?  Do they need a full hour?

19         COURTROOM DEPUTY:  They would like an hour, Judge.

20  And we still have to do exhibits and I need time for lunch,

21  too.

22         THE COURT:  All right.  We will call you.  We will

23  let you know.

24         Somewhere around 2:00.

25         COURTROOM DEPUTY:  Because I don't know what we're

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT

1  doing here.

2          THE COURT:  Yeah, I know.

3      (Pause.)

4          THE COURT:  Is there anyone else to be excused?

5          MR. GRIMBERG:  In the nick of time, my assistant

6  brought it for me.

7          THE COURT:  All right.

8          Who are the gentlemen who have been sitting in the

9  back?

10         MR. GRIMBERG:  This is special agent Chad Hunt, the

11 supervisor of the cyber squad.

12         THE COURT:  Okay.  And the other people on your team

13 with you?

14         MR. GRIMBERG:  Yes.  One is not, Judge.  He left.

15         THE COURT:  All right.

16         All right.

17         (End of transcript request excerpt.)

18                              *  *  *

19         I certify that the foregoing is a correct transcript

20 from the record of proceedings in the above matter.

21

22 Date:  April 12, 2017

23

24         s/ JUDITH M. WOLFF, CERTIFIED REALTIME REPORTER
           Signature of Court Reporter

25

STENOGRAPHICALLY REPORTED, COMPUTER-AIDED TRANSCRIPT